UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COMPREHENSIVE CARE
CORPORATION,

          **Plaintiff,**

vs.                          **Case No. 8:10-CV-942-T-27TGW**

JERRY KATZMAN and
MARGARET "PEGGY" HUSTED,

          **Defendants.**

_____/

### ORDER

**BEFORE THE COURT** is Defendant Peggy Husted's Motion for Summary Judgment (Dkt. 74), to which Plaintiff has responded (Dkt. 88), and the parties' supplemental submissions (Dkts. 96, 97). Oral argument was presented on May 23, 2011. Upon consideration, the motion is GRANTED.

### *Background*

Core Consulting Group, Inc. ("Core") was formed about September 8, 2008. Dkt. 1 ¶ 15. Defendant Jerry Katzman was one of three co-founders of Core, Senior Vice President and Secretary of Core, and a member of its board of directors.[1] Core's other co-founders were Clark Marcus, Core's Chief Executive Officer and the chairman of its board of directors, and Giuseppe Crisafi, Core's Chief Financial Officer and a member of its board of directors. *Id.* ¶ 16; Marcus Aff. ¶ 5;

---

[1] *See* Dkt. 1 ¶ 16; April 20, 2010 Affidavit of Clark Marcus ("Marcus Aff." [Dkt. 1-1]) ¶ 5; April 20, 2010 Affidavit of Giuseppe Crisafi ("Crisafi Aff." [Dkt. 1-2]) ¶ 4; April 22, 2010 Affidavit of Giuseppe Crisafi ("2d Crisafi Aff." [Dkt. 11]) ¶ 19; Dkt. 36 at 84:6-10; 167:19-25.

Crisafi Aff. ¶ 4.  Defendant Peggy Husted is Katzman's fiancé.[2]

The three founders formed Core for the purpose of developing products complimentary to those of Plaintiff Comprehensive Care Corporation ("CompCare"), acquiring a controlling interest in CompCare, and thereafter causing CompCare to engage in a "reverse merger (acquisition of Core)." 2d Crisafi Aff. ¶ 14.  The three founders funded Core's operations with their own funds. Dkt. 36 at 86:12-87:1; 127:4-128:4.  From October 1, 2008 to December 31, 2009, Marcus and Katzman worked long hours, seven days per week, on behalf of the newly formed company.  *Id.* at 49:19-50:2.  That is, in addition to their funds, the founders invested substantial "sweat equity" in the corporation.  *Id.* at 128:5-12.

Although she was never an employee of Core and had no other formal relationship with the company, Husted claims that during this period she performed  various secretarial tasks that benefitted Core for Marcus and Katzman, at least some of which (*e.g.*, typing an eight-line email) were performed at Marcus's request.  Husted claims the tasks took her about ten hours per week. April 22, 2010 Declaration of Peggy Husted (Dkt. 7-1) ¶ 9.  Husted also claims that Marcus told her he would find a way to compensate her even though Core did not have any income.  *Id.* ¶ 4.

### The Complaint

The Complaint, which is verified by Guiseppe Crisafi and incorporates by reference the affidavits of Crisafi and Marcus, *see* Fed. R. Civ. P. 10(c), includes the following averments.

At some time before January 20, 2009, Katzman directed Crisafi, who was responsible for the issuance of all Core shares, to issue 3,250,000 shares of Core's Class B Common Stock

---

[2]  Mar. 4, 2011 deposition of Margaret "Peggy" Husted ("Husted Dep." [Dkt. 89]) at 8:19-9:2.

2

(hereafter, the "Core shares") to Husted. Dkt. 1 ¶ 20; *see also* Crisafi Aff. ¶ 6. "Katzman fraudulently represented to Crisafi that the shares were being issued to Husted appropriately for good and valuable consideration." Dkt. 1 ¶ 21; *see also* Crisafi Aff. ¶ 6. In reliance on Katzman's misrepresentation, Crisafi directed the issuance of the Core shares to Husted. Dkt. 1 ¶ 21; *see also* Crisafi Aff. ¶ 13. Katzman and Husted knew at the time the shares were issued that Husted was not a Core employee and had rendered no services for Core and that "there was no consideration for even a single share of Core stock to be issued." *Id.* ¶¶ 22-23. A review of the corporate records disclosed that "there is no indication that the 3,250,000 shares were issued by Core for consideration." Dkt. 1 ¶ 25.

At the time, the Core shares were valued by the board at about $3,000. 2d Crisafi Aff. ¶ 16; *cf.* Husted Decl. ¶ 10 (the Core shares had "a par value of $.001 per share"). Core issued Husted an IRS Form 1099-Misc reflecting payment to Husted of $3,250.31 in non-employee compensation. Husted Decl. ¶ 10 & Ex. D.

In January 2009, Core purchased 51% of CompCare's stock (or voting stock) from its controlling shareholder for $1.5 million. *See* 2d Crisafi Aff. ¶ 21; April 22, 2010 Affidavit of Joseph Sanders ("Sanders Aff. [Dkt. 12]) ¶¶ 13-15. About January 20, 2009, all of Core's outstanding shares were acquired by CompCare through a reverse merger. Crisafi Aff. ¶ 7.[3] As part of the

---

[3] The mechanics of the acquisition are not clear. Crisafi avers that Core first acquired a controlling interest in Compcare, and thereafter CompCare engaged in a "reverse merger" with Core. 2d Crisafi Aff. ¶¶ 10, 14-15, 21. However, Core did not cease to exist but became a wholly owned subsidiary of CompCare. *See* Marcus Aff. ¶ 12; Dkt. 34 at 2 ("Core is a wholly owned subsidiary of CompCare . . . ."); *id.* at 34 (""[I]t is feasible that Core could be joined [as a party to this lawsuit], as it exists as a wholly owned subsidiary of Plaintiff . . . ."). As Core retained its separate existence, the transaction could not have been a simple two-party statutory merger. *See* 8 Del. C. § 259(a) ("When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, *shall cease* and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations as the

merger, Core shareholders surrendered their Core shares for cancellation in exchange for shares of CompCare common stock. *Id.*

Husted avers that Marcus asked her to vote her Core shares in favor the merger and she did so. Husted Decl. ¶ 12. Pursuant to the merger agreement, Husted surrendered her Core shares and received 1,995,959 shares of CompCare's common stock (as well as 3,966 shares of CompCare's series C convertible preferred stock, convertible into 1,254,353 shares of CompCare common stock) in exchange. Dkt. 1 ¶¶ 5 n.1, 31-32; Crisafi Aff. ¶ 7; Marcus Aff. ¶ 14; Pretrial Statement (Dkt. 93) § 9(d)-(e). Husted's shares were exchanged "in the normal course of the reverse merger by [CompCare] of Core." 2d Crisafi Aff. ¶ 17. At that time, CompCare's publicly tradable shares had a value of about $.15 or .25 per share. *See id.* ($.025 per share); Sanders Aff. ¶ 11 ("[W]hen Defendant Husted acquired her [CompCare] shares in January 2009, said shares were trading at about $0.15 per share."); *id.* ¶ 27 (same).

Katzman was employed as a senior executive of CompCare on May 11, 2009. Dkt. 1 ¶ 31; Marcus Aff. ¶ 15. Some time following thereafter, Katzman's employment was terminated. *Id.* Some time in January, 2010, CompCare learned that Katzman and Husted were seeking to obtain the removal of a standard restrictive legend pursuant to Securities and Exchange Commission Rule

---

case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated") (emphasis added); Balotti and Finkelstein's Del. Law of Corp. & Bus. Org § 9.26 ("The effect of Section 259 is that '[w]hen a consolidation or merger has taken place under the statute, the old corporations have their identity absorbed into that of the new corporation or the one into which they were merged.") (citation omitted).

Possibly, the transaction consisted of a so-called reverse triangular merger, in which the acquiring entity (CompCare) forms a subsidiary, and the newly created subsidiary merges with the target company (Core), with the result that the target company (Core) survives the merger but the acquiring entity (CompCare) holds all of the target company (Core) stock. *See* Balotti and Finkelstein' § 9.7-9.8 (describing triangular and reverse triangular mergers); 1 Corporate Acquisitions and Mergers § 5B.02[11] (Matthew Bender 2011) (describing triangular and reverse triangular mergers).

144 restricting their public sale from Husted's CompCare shares.  Marcus Aff. ¶ 18.  As a result, CompCare initiated an investigation to determine how Husted, a non-employee of Core and CompCare, came to possess almost two million shares of CompCare stock.  *Id.* ¶ 19.

As part of the investigation, CompCare reviewed Core's minutes, interviewed corporate officers, and reviewed employment and payroll records and contracts.  *Id.*  Crisafi avers that "literally no one in the corporation had any knowledge as to the basis upon which [the Core] shares were issued to Ms. Husted since said shares were issued entirely upon the request of Defendant Katzman and his representation to [Crisafi] that consideration had been received by Core from Ms. Husted."  Crisafi Aff. ¶ 13.

CompCare also reviewed Katzman's and Husted's depositions in a related lawsuit, *Comprehensive Care Corporation v. Katzman*, No. 8:09-CV-1375-T-24-TBM. Dkt. 1 ¶ 37; Marcus Aff. ¶¶ 20, 24-25; Crisafi Aff. ¶¶ 14-16.   In his deposition in the related lawsuit, Katzman denied that he gave any CompCare shares to Husted or requested that CompCare issue any stock to Husted and stated his belief that the Core shares were issued to Husted as non-employee compensation for work she did for Core and they were subsequently exchanged for CompCare shares as a result of the merger.  Dkt. 1 ¶ 38.  In her deposition in the related lawsuit, Husted stated that Katzman gave her more than one million CompCare shares.  *Id.* ¶ 40.

Based on Katzman and Husted's testimony in the related lawsuit and Marcus' information that Husted never worked for Core, CompCare concluded that Katzman was lying, that Husted's testimony that Katzman *gave* her the shares was more credible, "and that there was no consideration whatsoever for the issuance of the Core shares or CompCare shares to Husted."  *Id.* ¶ 41; *see also* Marcus Aff. ¶ 20 ("As a result of its internal investigation, Plaintiff discovered . . . that in fact the

5

shares were not issued for good and valuable consideration, or any consideration at all, for that matter.").

In sum, CompCare's investigation "conclusively determined . . . that there was no consideration for the [CompCare] shares held by Husted and that they were unauthorized and obtained through fraud and collusion." *Id.* ¶ 42.[4] Accordingly, CompCare took steps to cancel the shares, which it believed were voidable under Delaware law. Dkt. 1 ¶ 43.

In a January 21, 2010 letter to Husted, CompCare informed Husted that her CompCare shares were issued without consideration as required by Delaware law, had been canceled and demanded return of the CompCare stock certificates. *Id.* ¶ 44 & Ex. F (Dkt. 1-6). Husted refused and continued to seek the removal of the restrictive legend to permit sale of the shares. *Id.* ¶ 45.

The Complaint alleges in Count I that Katzman and Husted engaged in a scheme to defraud that violated Section 10(b) of the Securities Exchange Act of 1934, *as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C .F.R. § 240.10b-5. Count II asserts a claim against Husted and Katzman for conversion of the CompCare shares, and Count III asserts a claim against Katzman for breach of fiduciary duty.

On December 7, 2010, after having thrice sought and once obtained provisional injunctive relief based on the claims in the Complaint, and while a motion to dismiss the Complaint remained pending, Plaintiff voluntarily dismissed its claims against Katzman. (Dkt. 65). On January 18, 2011, the Court dismissed Count I as to Husted for failure to state a claim upon which relief can be granted.

---

[4] At the hearing on Plaintiff's application for a temporary restraining order in this matter, Plaintiff's counsel represented that, apart from Katzman's representation that Husted received the Core shares for work performed (which they did not believe), Plaintiff's executives had averred in their affidavits that "they have no idea how [Husted] ended up with [the Core shares]." Dkt. 49 at 18:4-8.

(Dkt. 80).

### The Testimony

Plaintiff states that Husted's reliance on testimony from the preliminary injunction hearing in this matter is "suspect." (Dkt. 88 at 10 n.3). Plaintiff appears to suggest that the Court cannot rely on testimony given at the preliminary injunction hearing in deciding this motion for summary judgment. *See id.* at 10-11 (stating that, in *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056 (3d Cir. 1991), the Third Circuit "concluded that the district court erred when, assessing the evidence before it on summary judgment, the district court included *evidence produced at the preliminary injunction hearing* and the factual findings developed at that hearing.") (emphasis added).

If so, Plaintiff reads *Country Floors* too broadly. In that case, the Third Circuit held that the district court erred when it "used the *findings and credibility determinations* that it made in the preliminary injunction hearing to decide the [defendant's] motion for summary judgment." 930 F.2d at 1058 (emphasis added). Fact findings and credibility determinations are inconsistent with the Court's task on summary judgment, which is to determine whether genuine issues of material fact remain for trial − not to decide those issues or to weigh the evidence. *Id.* at 1062.

Country Floors therefore recognizes a distinction between impermissibly relying on prior fact findings and credibility determinations made during a preliminary injunction hearing, and the appropriate consideration of record evidence. Generally, "summary judgment decisions may be based on any admissible evidence." *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1242 (11th Cir. 1991) (citing *Property Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 n.4 (11th Cir. 1985)). For example, so long as they comply with the requirements of Fed. R. Civ.

56(c)(4), affidavits offered in support of a preliminary injunction motion are part of the summary judgment record and are properly considered in deciding whether a genuine issue of fact remains for trial. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987).

Plaintiff provides no persuasive reason for a categorical rule that such evidence may not be considered. The only authority Plaintiff suggests for such a rule is a stray comment in *Country Floors* that "the district court's assessment of the evidence before it on summary judgment, since it included *evidence produced at the preliminary injunction hearing* and the factual findings developed at the hearing, [was] in error." 930 F.2d at 1063 (emphasis added). This comment should not be construed as stating a broad rule that a district court may not consider, in deciding a summary judgment motion, evidence previously submitted in support of a preliminary injunction. To the extent it stands for that broad rule, *Country Floors* is inconsistent with controlling precedent in this circuit. *See Clinkscales*, 831 F.2d at 1570 ("The affidavits appended to appellant's motion for a preliminary injunction were . . . part of the written record before the district judge at the time he ruled on the summary judgment motions. These affidavits were therefore properly before the district court.").[5]

Indeed, the Eleventh Circuit has implicitly acknowledged that the transcript of a preliminary injunction hearing is properly considered part of the summary judgment record. *Id.* at 1570 (testimony from preliminary injunction hearing was not part of summary judgment record because

---

[5] *See also* 2 Bus. & Com. Litig. Fed. Cts. § 14:15 (2d ed.) ("Parties may . . . use evidence submitted at preliminary injunction proceedings to support or oppose a motion for summary judgment, although [Fed. R. Civ. P. 56] does not explicitly address such use."); *Raitport v. National Bureau of Standards*, 385 F. Supp. 1221, 1222-23 (E.D. Pa. 1974) ("The record in this action includes the pleadings, affidavits, a partial transcript of the hearing on [Plaintiff's] motion for preliminary injunction, and a certified copy of the administrative record. This entire record may properly be considered in determining whether to grant a motion for summary judgment.").

it was not transcribed until after district court ruled on the summary judgment motion). Moreover, a rule precluding use of preliminary injunction hearing testimony to support a motion for summary judgment would be inconsistent with (1) Rule 56's provision allowing the use of otherwise admissible deposition testimony to support or oppose a motion for summary judgment,[6] (2) the well-established rule that deposition testimony may be considered even if it does not meet the requirements of Fed. R. Civ. P. 32(a) so long as the testimony meets the requirements of an affidavit pursuant to Fed. R. Civ. P. 56 in that the testimony is sworn, competent, based upon personal knowledge, and sets out facts that would be admissible at trial,[7] and (3) Rule 65's provision that admissible evidence received on a motion for preliminary injunction "becomes part of the trial record and need not be repeated at trial." Fed. R. Civ. P. 65(a)(2).

In sum, to the extent Plaintiff contends that the Court cannot consider testimony given at the preliminary injunction hearing for the limited purpose of deciding whether any material issue of fact

---

[6] *See* Fed. R. Civ. P 56(c)(1); *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir. 1995) ("A party's own deposition can constitute affirmative evidence to defeat a summary judgment motion.") (internal quotation marks and citation omitted); 11 James W. Moore *et al.*, Moore's Federal Practice ¶ 56.93[1][a] ("Depositions may be cited in support of or in opposition to a motion for summary judgment to support an assertion that a fact cannot be or is genuinely disputed."); *cf.* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2722 (3d ed.) ("Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary-judgment motion . . . .").

[7] *See Vondriska v. Cugno*, 368 F. App'x 7, 8–9 (11th Cir. 2010) (although deposition did not comply with Fed. R. Civ. P. 32(a), the district court erred in not considering the testimony when ruling on a motion for summary judgment because the deposition testimony met the requirements of affidavit pursuant to Fed. R. Civ. P. 56 in that the testimony was sworn, competent, based upon personal knowledge and set out facts admissible at trial); *Tingey v. Radionics*, 193 F. App'x 747, 765–66 (10th Cir. 2006) (permitting the use of a deposition as an affidavit at the summary judgment stage against a defendant who had no notice of its taking); *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966-67 (9th Cir. 1981) (holding that deposition taken without opportunity for opposing counsel to cross-examine could not be admitted as deposition, but could be admitted as equivalent of affidavit under Rule 56); 8A Federal Practice and Procedure § 2142 ("A deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible, even though the conditions of the rule on use of a deposition at trial [Fed. R. Civ. P. 32] are not satisfied."); 7 Moore's Federal Practice § 32.06 ("A deposition may generally be used as the equivalent of an affidavit in motion practice, even though Rule 32 would bar receipt of the deposition as evidence at trial. If the deposition was taken under oath and was based on personal knowledge, it is at least the equivalent of an affidavit. The most common use reported has been in summary judgment proceedings.").

remains for trial, the Court disagrees. As Plaintiff does not assert that any of the preliminary injunction testimony cited in Husted's motion was unsworn, was not based on personal knowledge, or fails to set forth facts that would be admissible at trial, the Court will consider it.

As a result of discussions Crisafi had with Marcus and Katzman, it was decided that "founder shares" in Core would be issued to each of the three co-founders; about 3 million shares each to Marcus and Katzman (as they had spent more time on the business) and a smaller number to Crisafi. *See* Dkt. 36 at 88:3-18; 98:15-22; 195:9-12. The board agreed to the issuance of these shares (the "founder shares"). *Id.* at 110:2-6; 111:22-112:1. In accordance with what he described as the founders' purpose in forming Core, Crisafi believes that all the founders knew that whatever shareholdings they might obtain in Core "would ultimately be exchanged for shares of [CompCare] by way of the contemplated reverse merger/acquisition." 2d Crisafi. Aff. ¶ 20.

Marcus directed Crisafi to issue his founder shares in the names of his children. *Id.* at 88:22-89:3. Marcus' children did not work for Core. *Id.* at 128:13-15; 207:11-21. Rather, "[Marcus] essentially gifted that stock to his children." *Id.* at 99:25-100:2.[8] Indeed, Marcus believes that the children rightfully own the shares. *See id.* at 191:22-192:12. Similarly, Crisafi's founder shares were issued in the name of a third-party, a company called Voloch Proprietary. *Id.* at 109:16-24; 111:19-21. Voloch performed no services for Core. *Id.* at 128:18-31.

Similarly, Katzman asked Crisafi to issue Katzman's founder shares in the name of Husted. *Id.* at 90:2-4; 95:14-19; 106:20-107:1. Katzman's request did not surprise Crisafi. *Id.* at 90:4-5. Crisafi believed that Katzman wanted his founder shares issued in Husted's name either to protect

---

[8] Marcus suggested that he did so for estate-planning purposes. Dkt. 36 at 182:9-15.

the shares from Katzman's creditors or for estate-planning purposes. *Id.* at 90:7-9; 92:3-9.   Crisafi believed that the shares were authorized and allotted to Katzman and he was entitled to do with them as wished. *Id.* at 90:21-23.[9]

Accordingly, Crisafi directed Core's chief accounting officer to take the necessary actions to issue Katzman's founder shares, *i.e.*, 3,250,000 shares of Core's Class B Common Stock, to Husted. *See id.* at 113:19-20; Crisafi Aff. ¶ 6.   The Core shares were issued to Husted at or around the same time that Marcus's and Crisafi's founder shares were issued to Marcus' children and to Voloch, respectively.   Dkt. 36 at 139:6-7.

After the issuance of the Core shares, Crisafi handed the stock certificate evidencing the shares to Katzman. *Id.* at 96:22-97:1.   Crisafi handed the certificate to Katzman because he believed "it was [Katzman's] stock." *Id.* at 97:5-7.   Based on his experience working with the other board members, Crisafi believed that the other members of the board, like himself, "all believed that that was Jerry Katzman's stock." *Id.* at 97:10-13.   The issuance of Katzman's founder shares to Husted was perfectly acceptable to the board. *Id.* at 101:5-17.   In sum, when he directed issuance of the Core shares to Husted, Crisafi believed that Katzman had "gifted" his founder shares to Husted. *Id.* at 100:3-7.   Crisafi himself "didn't even question [Katzman's request to issue his founder shares to Husted] at the time." *Id.* at 102:19-24; *see also* 2d Crisafi Aff. ¶ 15 ("I had no reason to question Defendant Katzman's instructions.").

Crisafi's testimony is impossible to reconcile with his earlier averment that the Core shares were issued on the basis of Katzman's representation that "consideration [for the Core shares] had

---

[9] At the preliminary injunction hearing, Plaintiff's counsel stated: "There's no dispute in this case that there was consideration from Jerry Katzman, that the time he put in was valuable and he was entitled to one-third ownership of the company as a founder." (Dkt. 50 at 38:21-24).

been received by Core *from Ms. Husted.*" Crisafi Aff. ¶ 13.  Moreover, Crisafi effectively retracted

his averment that Katzman made any representation at all regarding the consideration supporting the

shares to be issued.  *See* Crisafi Aff. ¶ 6.  ("It was represented to me at that time by Defendant

Katzman that the shares were being issued appropriately for good and valuable consideration.").

Crisafi stated that, in fact, when Katzman directed Crisafi to issue the shares to Husted, Crisafi

merely inferred or assumed that there was adequate consideration supporting the shares – namely,

Katzman's sweat equity in the company.  Dkt. 36 at 100:8-101:4; 107:16-108:2.  As Crisafi now

admits, all that Katzman said to him was, "can you issue my shares in [Husted's] name?"  *Id.* at

106:25-107:1.

Indeed, during his testimony at the preliminary injunction hearing, Crisafi agreed that it might

have been more accurate if he had stated in his affidavit, not that *Katzman represented* that the

shares were being issued appropriately for good and valuable consideration, but merely that *he,*

*Crisafi, inferred* from Katzman's request for issuance of the shares to Husted they were being issued

for good and valuable consideration.  *Id.* at 107:24-108:2.[10]  Crisafi stated that he would not have

issued the shares to Husted (and indeed could not have done so without board approval) had he

believed the purpose of the issuance was to compensate Husted for services she performed for Core.

*See id.* at 92:10-94:25; 105:11-106:8.

Husted claims that, some time in December 2008, Katzman told her she received the Core

---

[10]  When he was asked to confirm that he was retracting his original averment, Crisafi again admitted that
Katzman did not affirmatively represent that the shares were being issued appropriately for good and valuable
consideration – that is, Katzman did not make the representation Crisafi previously attributed to him in his sworn
affidavit. Dkt. 36 at 143:16-18.  However, Crisafi believed his original averment was *arguably* accurate because
Katzman did not correct Crisafi's assumption or inference that the shares were being issued for good and valuable
consideration.  *Id.* at 143:4-15. At times, Crisafi appeared to abandon even this position by stating that his
assumption or inference (that the Core shares were Katzman's founder shares) was accurate, *see id.* at 116:9-13, in
which case correction by Katzman of Crisafi's subjective belief was unnecessary, if not impossible.

shares for her work for the company.  Husted could not explain why Core or any person acting on its behalf would compensate approximately 120 hours of part-time secretarial work performed by a non-employee with the same number of shares it had decided to issue to two founders of the company (Marcus and Katzman) who worked 1200 or more hours during the same period and invested their own money in the company, and with an even larger number of shares than it had decided to issue to the third founder (Crisafi).  Dkt. 36. at 56:10-57:25.

Katzman testified that, although his 3,250,000 founder shares were initially issued to him and endorsed by him as secretary of the corporation, they were returned for cancellation within a few days owing to Marcus' belief (communicated to Katzman about twenty-four hours after the issuance) that ownership of Core shares by the founders created a conflict of interest. *Id.* at 155:6-157:25. Katzman testified that Marcus also informed him (at the same time Marcus informed Katzman that all founder shares had to be cancelled), that he, Marcus, would be issuing 3,250,000 Core shares to his children, Crisafi would be issuing 2.5 million shares to his designated family member or company, and the cancellation of Katzman's 3,250,000 shares would not "be an issue because [Husted] was working for the company and [Marcus] could issue the shares to her for compensation for the work she performed." *Id.* at 156:4-7.

Although according to Katzman, Marcus told him the issuance of the 3,250,000 Core shares to Husted would prevent the cancellation of Katzman's 3,250,000 founder shares from becoming an "issue," Katzman denies that he gave his founder shares to Husted or directed their re-issuance to her. Although agreeing with other witnesses that he was working very hard for Core, and although stating that he protested the decision to issue 2.5 million Core shares for Crisafi, Katzman incredibly contends that when his 3,250,000 founder shares were cancelled, this was a matter of indifference

to him because the value of the shares was insignificant as compared to other benefits he expected from his association with Core. *Id.* at 155:13-159:5.

Katzman admits that, as his 3,250,000 founder shares initially issued were cancelled and the same number of shares was then issued to Husted, "one could look at the two numbers and say, well, [Marcus] took the numbers from here and he gave it to [Husted] on the other side." *Id.* at 163:20-24. But Katzman rejects this "characterization" of the Core shares issued to Husted. *Id.* at 158:13. Katzman's "impression" was that his founder shares were simply cancelled. *Id.* at 158:13-14. He insists that, whatever Marcus's motive may have been, he, Katzman, did not request the substitution and had nothing to do with it and was told by Marcus "that they were issuing those [shares] for compensation to [Husted]." *Id.* at 163:25-164:6. Katzman further admits that, as corporate secretary, he signed the stock certificate evidencing the Core shares issued in Husted's name when he was asked to do so. *Id.* at 168:9-17. But he states that his duties as secretary were mostly performed by Marcus's secretary, who "essentially almost [held the] position," and he insists that it was Marcus's decision to issue the Core shares to Husted. *Id.* at 168:11-169:9.

Marcus agreed that Katzman returned his founder shares for cancellation. Dkt. 50 at 15:7-9. Marcus believed at the time that Katzman was having his founder shares re-issued to Husted. *Id.* at 15:9-16. Marcus believed that the re-issued shares were issued at Katzman's request and "stood in place of the three million two hundred and something thousand shares that [Katzman] cancelled." *Id.* at 15:22-25. Marcus knew that 3,250,000 Core shares were issued in Husted's name. Dkt. 36 at 183:6-11; 193:8-13. At the time, Marcus believed that the shares were Katzman's and that Katzman requested their issuance in Husted's name to protect them from Katzman's creditors. *Id.* at 183:14-18; 194:5-9. In sum, Marcus thought the 3,250,000 shares issued to Husted were Katzman's founder

14

shares re-issued to Husted at Katzman's request. Dkt. 50 at 12:20-13:16; 15:20-24. Marcus states that he had no reason to believe that Husted acquired the shares in any other way than by gift of Katzman's founder shares until he reviewed Katzman's deposition testimony in the related lawsuit. *Id.* at 16:3-17.

### *Standard*

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249;

*Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

### Discussion

Under Florida law, conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984) (citing *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858 (Fla. 1948)). Conversion "may occur where a person wrongfully refuses to relinquish property to which another has the right of possession," and it "may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting *Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994)).[11]

However, "[t]here can be no conversion where a person consents to the possession by another of the assets allegedly converted." *In re General Plastics Corp.*, 184 B.R. 996, 1004 (Bkrtcy. S.D. Fla. 1995) (citing *Nat'l Bank of Melbourne v. Batchelor*, 266 So.2d 185, 187 (Fla. 4th DCA 1972)). *But cf.* Restatement (Second) of Torts § 252A (1965) ("Consent to possession of a chattel obtained by fraud . . . is not effective to prevent recovery . . . for conversion against any one other than a bona fide purchaser of the chattel. ").

Under Delaware law, shares of stock must be issued for consideration having a value (not

---

[11] *See also Klein v. Newburger, Loeb & Co.*, 151 So. 2d 879, 880 (Fla. 3d DCA 1963) (rejecting contention that complaint failed to state a claim for conversion of stock merely because defendant came into possession of the stock certificate through a mistake on the part of broker's employees).

less than the par value thereof, if any) determined by the board of directors (or by the shareholders if the certificate of incorporation so provides). Del. Code Ann. tit. 8, § 153. The consideration may include "any benefit to the corporation" (*e.g.*, services rendered), and if the board elects to receive non-cash consideration for stock, its judgment in regard to the value of the consideration received is conclusive in the absence of "actual fraud in the transaction." Del. Code Ann. tit. 8, § 152. *See also Fonds de Regulation et de Controle Café Cacao v. Lion Capital Mgmt., LLC*, No. 1509-N, 2007 WL 315863, at *4 n.9 (Del. Ch. Jan. 22, 2007). Although Section 152 requires directors to place a value on consideration for stock issued, "this valuation need not be formally recorded." *Id.* (citing *Bowen v. Imperial Theatres*, 115 A. 918, 920 (Del. Ch. 1922)).

Finally, whether stock issued without consideration is void or only voidable under Delaware law "is not as clear as it could be." *MBKS Co. Ltd. v. Reddy*, 2007 WL 2814588, at *6 (Del. Ch. 2007). Notwithstanding, "the modern trend of the law is that 'an issuance of stock without receipt by the company of valid consideration is void.'" *Id.* (quoting *Fonds de Regulation et de Controle Café Cacao*, 2007 WL 315863, at *4); *see also* 11 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5166 ("Certificates may be canceled where the shares represented were without consideration . . . or where there is a total failure of the consideration.") (citing cases).

Husted is entitled to summary judgment on Count II. First, the undisputed evidence demonstrates that Husted's CompCare shares were issued for consideration. She received the CompCare shares pursuant to the merger agreement (as Crisafi put it, in the normal course of the merger) and in exchange for valuable consideration – Husted's 3,250,000 shares of Core's Class B Common Stock. Plaintiff has presented no evidence whatsoever of fraud in the issuance of the CompCare shares. Moreover, both parties conceded during oral argument that they found no

authority addressing the exact situation presented here, where Corporation A claims conversion of its own shares based on lack of consideration, not in the issuance of Corporation A's shares, but in the issuance of shares of Corporation B (which was, at the time the shares were issued, unrelated to Corporation A) that the shareholder exchanged for the allegedly converted Corporation A shares. The absence of authority is no accident. Whatever claim Core might have, CompCare has none.

In its Notice of Supplemental Authority, Plaintiff suggests that "when a merger becomes effective the title to all other property or interest therein by each corporation prior to the merger is vested in the surviving corporation without reversion or impairment." (Dkt. 97 at 2) (citing Fla. Stat. § 607.1106); *see also Corporate Exp. Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 413-15 (Fla. 2003). Even assuming the Florida merger statute (rather than Section 259(a) of the Delaware's General Corporation Law) would govern the legal effect of the merger of two Delaware corporations,[12] the Core-CompCare acquisition was clearly not a two-party merger between those entities.

Like the Delaware merger statute, Section 607.1106(a) provides that "[e]very other corporation party to the merger merges into the surviving corporation and the separate existence of every corporation except the surviving corporation *ceases*." (emphasis added). Since Core still exists as a separate entity, Core cannot have merged with CompCare contemplated by Fla. Stat. § 607.1106(1), and Core's rights could not have been transferred to CompCare by operation of that statute. *See St. Petersburg Sheraton Corp. v. Stuart*, 242 So. 2d 185, 190 (Fla. 2d DCA 1970) ("Ownership by one corporation of all the stock of another corporation does not destroy the identity

---

[12] *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ( ("It is now well established that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs.").

of the latter as a distinct legal entity."); *Phillips*, 847 So. 2d at 411 ("[T]he 'fact that there is a change in ownership of corporate stock does not affect the corporation's existence or its contract rights, or its liabilities.'") (quoting *Sears Termite & Pest Control, Inc. v. Arnold*, 745 So.2d 485, 486 (Fla. 1st DCA 1999)).

Second, the record evidence demonstrates that the Core shares were issued to Husted with the approval of the Core board of directors as compensation for Katzman's contributions as a founder of the company, not as a result of any fraudulent misrepresentation.  Core even issued Husted an IRS Form 1099-Misc, reflecting payment of the shares to Husted. No reasonable jury could conclude that anyone who had anything to do with the issuance of these shares did so based on a belief that the Core shares were to be issued as compensation for Husted's work, or that they had been fraudulently induced to issue the shares to Husted, notwithstanding her testimony. Husted had no involvement in the decision to issue the shares, and her belief as to why the shares were issued is immaterial.  She has no personal knowledge of the matter and her opinion is based on what she was purportedly told by Katzman.  *See* Fed. R. Civ. P. 56(c)(4).

Further, no reasonable jury could infer from Marcus' alleged statement (that Katzman's 3,250,000 founder shares had to be returned for cancellation but that Marcus would be issuing 3,250,000 Core shares to his children, Crisafi would be issued 2.5 million shares to his designated company or family member, and the cancellation of Katzman's 3,250,000 shares would not "be an issue because [Husted] was working for the company and [Marcus] could issue the shares to her for compensation for the work she performed" [Dkt. 36 at 156:4-7]), that Marcus intended to direct issuance of 3,250,000 shares of Core stock – a number of shares equal to what the corporation had decided to pay its principal co-founder for more than 1200 hours of work, and equal to the amount

19

previously issued to Katzman himself for his contributions as a co-founder – as compensation for a few hours of secretarial work performed by a non-employee with no formal relationship with the company.    Even if Katzman actually believes what he described as his "impression" and "characterization" of the reason for issuance of the shares, no reasonable juror would accept it.

Regardless, Katzman's belief or impression about Marcus' understanding or intentions is immaterial, considering that it was not Marcus but Crisafi who directed the issuance of the Core shares. Indeed, Crisafi was responsible for the issuance of all Core shares.  Crisafi Aff. ¶ 5.  And Katzman stated that he probably did not communicate Marcus' purported "decision" (as Katzman characterizes it) to issue the Core shares as compensation to Husted to Crisafi. Dkt. 36 at 24-161:9. Crisafi testified without contradiction that he directed issuance of the shares to Husted for the purpose of compensating Katzman with his founder shares, to which he was undisputedly entitled.

Additionally, although issuance of 3,250,000 founder shares to Katzman as part of the formation of Core was authorized, the record evidence demonstrates that neither Marcus nor Crisafi nor anyone else was authorized to direct issuance of the Core shares as compensation to any employee or consultant without board approval, and there is no evidence that any such approval was ever requested or obtained. In any event, by his acquiescence in the issuance of the Core shares to his companion, Katzman objectively manifested his agreement to the issuance of the Core shares to Husted in lieu of the originally issued founder shares.

Above all, and it bears repeating, there is not one scintilla of evidence of fraud in the issuance of the Core shares.  Notwithstanding Katzman's testimony that he returned his founders shares and never requested that they be re-issued to Husted, and without assessing his credibility, Core's board authorized issuance of the shares as compensation to Katzman.  At most, in the light most favorable

20

to the non-moving party, there was only a mistaken reason for re-issuance of Katzman's founder shares to Husted. Regardless, Core's board authorized the issuance. Like its securities fraud claim, Plaintiff's conversion claim is expressly based on the theory that the Core shares issued to Husted were issued for no consideration based on Katzman's fraudulent representation. Crisafi has retracted the only evidence in the record that Katzman made any such representation.

Because CompCare undisputedly received from Husted valuable consideration in esxchange for issuance of the CompCare shares and the record contains no substantial evidence that the Core shares were improperly issued without consideration based on fraudulent misrepresentations, Plaintiff's conversion claim fails as a matter of law.

### *Conclusion*

For the foregoing reasons, Defendant Peggy Husted's Motion for Summary Judgment (Dkt. 74) is **GRANTED**.

Plaintiff's Motion in Limine to Exclude Evidence of Prior Litigation (Dkt. 99) and the parties' motions (Dkts. 104, 105) for permission to bring laptop computers into the Sam M. Gibbons Federal Courthouse as an exception to the Local Rules are **DENIED** as moot.

The Clerk is directed to enter final judgment in favor of Defendant Husted and close this case.

**DONE AND ORDERED** at Tampa, Florida this 20th day of July, 2011.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

21